1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                   **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    MARCUS JAMAL DAVIS,                    No.  2:16-CV-1895-DMC-P

12                      Petitioner,

13           v.                              MEMORANDUM OPINION AND ORDER

14    SUZANNE M. PEERY,

15                      Respondent.

16

17              Petitioner, a state prisoner proceeding with retained counsel, brings this petition

18   for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  Pursuant to the written consent of all

19   parties (ECF Nos. 5 and 12), this case is before the undersigned judge for all purposes, including

20   entry of a final judgment.  See 28 U.S.C. § 636(c).  Pending before the court are petitioner's pro

21   se petition for a writ of habeas corpus (ECF No. 1), respondent's answer (ECF No. 15), and

22   petitioner's traverse (ECF No. 29), filed by petitioner's counsel.

23   / / /

24   / / /

25   / / /

26   / / /

27   _____
            [1]        Counsel filed a substitution of attorneys and proposed order on September 13,
28   2017.  The order was never signed by the court, which will herein approve the substitution nunc
     pro tunc to September 13, 2017.

                                              1

# I. BACKGROUND

A.    **Facts**[2]

Findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence. See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012). The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> Defendant Marcus Jamal Davis shot and killed Chester Jackson after an altercation at a restaurant. A jury convicted defendant of first degree murder and found true the allegations that defendant personally and intentionally discharged a firearm, proximately causing great bodily injury or death to Jackson. The trial court sentenced defendant to an aggregate of 50 years to life in prison.
>
> * * *
>
> Defendant twice moved from his table in a restaurant to an empty booth behind Chester Jackson and then talked on defendant's cell phone. A confrontation ensued. Jackson had the equivalent of six alcoholic drinks in his system. Defendant had at least eight alcoholic drinks over the course of the evening. According to James Powell and Torrien Smothers, defendant "wanted to start something" when he aggressively said "what's up" to Jackson, Powell, and Smothers inside the restaurant. Defendant and Jackson said "what's up" to each other. Jackson told a friend, during a cell phone conversation, that he was "about to get into it" with some guys. Defendant and everyone at Jackson's table stood up. Powell was ready to hit defendant if Jackson swung at defendant. But codefendant Robert Earl Lucas intervened, saying "it's good" or "it's cool."
>
> Defendant, Lucas, and defendant's friend Mary McCain told a very different story. They said defendant moved from his table to a table behind Jackson to talk on his cell phone when he received a call from his girlfriend. Defendant claimed no words were exchanged between him and Jackson's group at that time. Defendant later returned to the table behind Jackson because he thought there was another call on his cell phone. This time, Jackson turned around and said "what's up" to defendant. Defendant answered "what's up" and returned to texting on his cell phone. Jackson asked defendant why defendant kept going over to the empty table. Defendant said he stood up when Jackson did. Then Jackson's friends also stood up. Lucas went over to see what was going on when he saw Jackson, Powell, Smothers and defendant stand up. Jackson asked why defendant

---

[2]    Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

was over in his area on the phone. Defendant replied, "what's the problem?" Lucas got between defendant and Jackson, Powell, and Smothers. Lucas told defendant to "keep cool." Lucas told Jackson and his group "is everything cool?" Jackson and his group answered everything was cool. Then Jackson left the restaurant with Powell and Smothers.

Unbeknownst to Lucas, defendant had walked out of the restaurant. Jackson walked out of the restaurant a few seconds behind defendant. Powell and Smothers were right behind Jackson. Jackson and defendant were fighting by the time Powell and Smothers walked outside. Smothers ran over and tried to break defendant and Jackson apart. Powell punched defendant twice in his side or back.

Lucas testified McCain asked him to get defendant, who had gone outside. Lucas saw Jackson and his group assaulting someone when he exited the restaurant. When he realized Jackson and his group were assaulting defendant, Lucas yelled at them to get off defendant.

A waitress heard raised voices outside the restaurant. She informed a manager there was a group of people fighting outside. The waitress and the manager did not see anyone with a gun. The manager did not see anyone with their hands up in the air.

But according to Smothers and Powell, Lucas pulled out a handgun when he exited the restaurant. Smothers said Lucas pointed the gun at Jackson, Powell, and Smothers. And Jackson, Powell and Smothers put up their hands and said, "It's cool. It's cool."

Powell said he ran away when he saw Lucas raise his gun. He maintained he did not see or hear any gunshots. Smothers, on the other hand, claimed Lucas shot in the direction of Jackson, Powell, and Smothers, and Powell and Smothers ran away after the shot was fired. Smothers claimed he ran back when he realized Jackson was not behind him, and he saw defendant point a handgun in Smother's direction and shoot four or five times. Smothers said he ran away again when those shots rang out.

Lucas testified he did not have a gun. He said he was one to two feet away from Smothers and about three feet away from defendant when he heard multiple gunshots. Lucas did not see anyone with a gun. He ran to his vehicle.

The restaurant manager ran to the front door of the restaurant when she heard about four gunshots fired in succession. She did not hear a single gunshot before she heard the multiple gunshots. She saw an African American man lying on the sidewalk and about four people running away. The manager saw a man she later identified as defendant walk toward the man lying on the sidewalk. According to the manager, defendant pulled out a gun as he approached the man on the sidewalk and stopped when he was one to two feet away from the man.

The manager heard defendant say, "I told you this mother fucking shit was going to happen." The manager testified defendant pointed his gun at the head of the man on the ground. The manager heard one gunshot after she turned away. When she opened the door again, she saw defendant walking away from the restaurant.

3

Surveillance video showed a dark colored sports utility vehicle leave at a high rate of speed from the restaurant parking lot at about the time of the shooting. Lucas and McCain left in Lucas's black sports utility vehicle and were later joined by defendant. Defendant told Lucas and McCain, "they hit me in the jaw." He said someone "jumped" him and took his chain. Police found defendant's gold chain and medallion on the sidewalk in front of the restaurant. The chain was broken.

Jackson was unarmed at the time of the murder. He had multiple gunshot wounds to his head, face, shoulder, forearm, neck, hip, thigh, and chest area. A forensic pathologist opined that the wounds to the head, face and forearm were consistent with Jackson lying on the sidewalk and the shooter firing at Jackson from above. One of the gunshot wounds was inflicted when Jackson had his back to the shooter. Jackson died as a result of the gunshot wounds to his head and torso.

Police located a "live bullet," a bullet that had not been fired from a firearm, at the top of the stairs outside the front door of the restaurant. A live bullet can be expended from a semi-automatic firearm if the shooter "racks the gun" or cycles a live round into the firing chamber of the gun to prepare it for firing. A police detective opined the shooter was standing on the upper landing area of the restaurant when the "live bullet" was cycled out of the gun. Eight spent cartridges were also found at the front of the restaurant. All the cartridges were fired from the same semi-automatic firearm. Two 10 millimeter bullets were recovered from Jackson's body. The "live bullet" was the same caliber and brand as the bullets recovered from Jackson's body and the spent cartridges recovered at the scene.

Defendant and Lucas turned themselves in to police four days after the shooting. Defendant did not have any injuries on his face, head, or body at that time.

McCain told police defendant and Lucas both had guns on the evening before the shooting. At trial, however, McCain denied that she saw defendant or Lucas with a gun. But police found gunshot residue on the driver's side floorboard of Lucas's vehicle.

Defendant testified at trial. He admitted he shot Jackson. Defendant said he felt someone punch him on the right side of his jaw as he was leaning over the outside railing of the restaurant with his eyes closed. He then felt someone punch him from the back, grab him and rip his chain off. He thought someone was robbing him. Defendant said he did not know who was attacking him. He panicked and tried to pull his gun out of his waistband when he was at the top of the landing area outside the restaurant. He fired his gun as fast as he could until he had fired all the bullets. He intended to defend himself. Defendant denied making the statement that the manager testified she heard the shooter make.

Defendant said when the shooting stopped, he saw someone on the ground. He did not see anyone else shooting and did not see Lucas with a gun that night. Defendant ran away because he was frightened. He did not tell Lucas or McCain that he shot someone. He kept his gun hidden from Lucas. He later threw the gun away.

///

4

Lucas testified he had never seen defendant with a gun, and had no reason to believe defendant had a gun at the restaurant.

People v. Davis, 2015 WL 7280796 (Cal. App. Nov. 18, 2015) (unpub.).

**B.** **Procedural History**

Petitioner was convicted following a jury trial of first-degree murder. The jury also found true the allegations that petitioner personally and intentionally discharged a firearm causing great bodily injury or death. Petitioner was sentenced to a term of 50 years to life in state prison. The California Court of Appeal affirmed the conviction and sentence, see id., and the California Supreme Court denied direct review without comment or citation, see ECF No. 13-11 (California Supreme Court's February 17, 2016, denial of petition for review). Petitioner did not seek post-conviction relief by way of any state court habeas petitions. See ECF No. 1, pg. 3.

## II. STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). The AEDPA does not, however, apply in all circumstances. When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo. See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner). When the state court does not reach the merits of a claim, "concerns about comity and

federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). Supreme Court precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless it "squarely addresses" an issue. See Moses v. Payne, 555 F.3d 742, 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently

than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where the state court identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See Wiggins v. Smith, 539 U.S. 510, 520 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 538 U.S. at 75-76. This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

7

1    The "unreasonable application of" standard also applies where the state court

2    denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

3    848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions

4    are considered adjudications on the merits and are, therefore, entitled to deference under the

5    AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

6    The federal habeas court assumes that state court applied the correct law and analyzes whether the

7    state court's summary denial was based on an objectively unreasonable application of that law.

8    See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

9

10                              **III.  DISCUSSION**

11          Petitioner raises five grounds for relief: (1) the trial court erred in instructing the

12   jury pursuant to CALCRIM No. 625 on voluntary intoxication; (2) the trial court erred in

13   instructing the jury pursuant to CALCRIM Nos. 522 and 570 regarding provocation; and (3) the

14   trial court abused its discretion in denying a continuance.  Petitioner also argues that, to the extent

15   trial counsel waived the jury instruction error claims, trial counsel was ineffective.[3]

16      **A.      Jury Instruction Claims**

17          Petitioner argues federal habeas relief is warranted because the trial court erred by

18   instructing the jury pursuant to CALCRIM No. 65 and because the trial court erred by not

19   instructing the jury regarding provocation.

20          A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a

21   transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083,

22   1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not available

23   for alleged error in the interpretation or application of state law.  See Middleton, 768 F.2d at

24   1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786

25   F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.

26   See Milton v. Wainwright, 407 U.S. 371, 377 (1972).  Thus, a challenge to jury instructions does

27          [3]     Petitioner's federal petition incorporates his brief on direct appeal filed in the
     California Court of Appeal.  In the state court, petitioner argued ineffective assistance of trial
28   counsel to the extent the appellate court found that claims had been waived at trial.

not generally give rise to a federal constitutional claim. See Middleton, 768 F.2d at 1085) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941). In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice." Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

In general, to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment." Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)). To prevail, petitioner must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp, 414 U.S. at 147). In making its determination, this court must evaluate an allegedly ambiguous jury instruction "'in the context of the overall charge to the jury as a component of the entire trial process.'" Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)). Further, in reviewing an allegedly ambiguous instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)). Petitioner's burden is "especially heavy" when the court fails to give an instruction. Henderson v. Kibbe, 431 U.S. 145, 155 (1977). Where an instruction is missing a necessary element completely, the "reasonable likelihood" standard does not apply and the court may not ". . . assume that the jurors inferred the missing element from their general experience or from other instructions. . . ." See Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994). In the case of an instruction which omits a necessary element, constitutional error has occurred. See id.

9

It is well-established that the burden is on the prosecution to prove each and every element of the crime charged beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 364 (1970). Therefore, due process is violated by jury instructions which use mandatory presumptions to relieve the prosecution's burden of proof on any element of the crime charged. See Francis v. Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510 (1979). A mandatory presumption is one that instructs the jury that it must infer the presumed fact if certain predicate facts are proved. See Francis, 471 U.S. at 314. On the other hand, a permissive presumption allows, but does not require, the trier of fact to infer an elemental fact from proof of a basic fact. See County Court of Ulster County v. Allen, 442 U.S. 140, 157 (1979). The ultimate test of the constitutionality of any presumption remains constant – the instruction must not undermine the factfinder's responsibility at trial, based on evidence adduced by the government, to find the ultimate facts beyond a reasonable doubt. See id. at 156 (citing In re Winship, 397 U.S. at 364).

Even if there is constitutional error, non-structural errors may be harmless. See Hedgpeth v. Pulido, 129 S.Ct. 530, 532 (2008) (per curiam) (citing Chapman v. California, 386 U.S. 18 (1967)). In the context of jury instructions, an error is not structural so long as the error does not "vitiat[e] all the jury's findings." Sullivan v. Louisiana, 508 U.S. 275, 2781 (1993) (holding that an erroneous reasonable doubt instruction resulted in structural error not subject to harmless error analysis). An instructional error which resulted in omission of an element of the offense was a trial error subject to harmless error review. See Hedgpeth, 129 S.Ct. at 532 (citing Neder v. United States, 527 U.S. 1 (1999)). An erroneous aider and abettor instruction is also not structural. See id. (citing California v. Roy, 519 U.S. 2 (1996) (per curiam)). A jury instruction which misstates an element of an offense is also not structural. See id. (citing Pope v. Illinois, 481 U.S. 497 (1987)). An erroneous burden-shifting instruction is also not structural. See id. (citing Rose v. Clark, 478 U.S. 570 (1986)). Finally, an instruction on multiple theories of guilt where one of the theories is improper does not result in a structural error requiring automatic reversal but is error subject to harmless error analysis. See id.

/ / /

In <u>Chapman</u>, a case before the Supreme Court on direct review, the Court held that "before a [non-structural] constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. A different harmless error standard applies to cases on collateral review. In <u>Brecht v. Abrahamson</u>, the Court stated that applying the <u>Chapman</u> standard on collateral review "undermines the States' interest in finality and infringes upon their sovereignty over criminal matters." 507 U.S. 619, 637. The Court also noted that the <u>Chapman</u> standard is at odds with the historic meaning of habeas corpus – which is meant to afford relief only to those who have been grievously wronged – because it would require relief where there is only a reasonable possibility that a constitutional error contributed to the verdict. <u>See id.</u> Therefore, in habeas cases, the standard applied in <u>Kotteakos v. United States</u>, 328 U.S. 750 (1946), governs harmless error analysis for non-structural constitutional errors. <u>See Brecht</u>, 507 U.S. at 637. Under this standard, relief is available where non-structural error occurs only where such error "had a substantial and injurious effect or influence in determining the jury's verdict." <u>Kotteakos</u>, 328 U.S. at 776.

Under <u>Beck v. Alabama</u>, 447 U.S. 625, 638 (1980), it is well-settled that, in capital cases, failure to give a lesser included offense instruction where the evidence supports the instruction results in constitutional error. However, there is no such settled rule for non-capital cases. <u>See Turner v. Marshall</u>, 63 F.3d 807, 819 (9th Cir. 1995), <u>overruled on other ground by Tolbert v. Page</u>, 182 F.3d 677 (9th Cir. 1999). As the court in <u>Turner</u> observed, there is a circuit split on the question. <u>See id.</u> In the Ninth Circuit, the <u>Beck</u> rule does not apply in non-capital cases. <u>See Bashor v. Risley</u>, 730 F.2d 1288, 1240 (9th Cir. 1984). The Eleventh and Tenth Circuits agree. <u>See Perry v. Smith</u>, 810 F.2d 1078, 1080 (11th Cir. 1987); <u>Trujillo v. Sullivan</u>, 815 F.2d 597, 602 (10th Cir. 1987). The Seventh and First Circuits only apply <u>Beck</u> in non-capital cases to prevent a fundamental miscarriage of justice. <u>See Tata v. Carver</u>, 917 F.2d 670, 672 (1st Cir. 1990); <u>Nichols v. Gagnon</u>, 710 F.2d 1267, 1272 (7th Cir. 1983). The Third and Sixth Circuits, however, generally apply <u>Beck</u> in all non-capital cases. <u>See Vujosevic v. Rafferty</u>, 844 F.2d 1023, 1027 (3rd Cir. 1988); <u>Ferrazza v. Mintzes</u>, 753 F.2d 967, 968 (6th Cir. 1984). The Supreme Court has not addressed the applicability of <u>Beck</u> in non-capital cases. Because

11

there is no clearly established Supreme Court precedent applying the <u>Beck</u> lesser included offense rule in non-capital cases, and because creating such a rule in this case would violate the non-retroactivity principles of <u>Teague v. Lane</u>, 489 U.S. 288 (1989), this court is bound to follow Ninth Circuit precedent.  Therefore, federal habeas relief is not available on this claim in non-capital cases.  <u>See</u> <u>Turner</u>, 182 F.3d at 819.

### 1.    CALCRIM No. 625

According to petitioner, the trial court erroneously instructed the jury pursuant to CALCRIM No. 625 "in a manner that erroneously prohibited the jury from considering [petitioner's] intoxication in evaluating whether he acted in imperfect self-defense."  ECF No. 1, pgs. 44-50.  Petitioner asserts CALCRIM No. 625 incorrectly conveyed to the jury that evidence of intoxication was not relevant to imperfect self-defense.  <u>See</u> <u>id.</u>  Regarding CALCRIM No. 65, the California Court of Appeal held:

> Defendant contends the trial court erred in instructing with CALCRIM No. 625 (voluntary intoxication: effects on homicide crimes). Specifically, defendant argues the trial court failed to instruct the jury that evidence of voluntary intoxication is relevant to his subjective state of mind for imperfect self-defense.
>
> Defendant asked the trial court to instruct the jury with CALCRIM No. 625. Consistent with CALCRIM No. 625, the trial court instructed the jury: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. [¶] You may consider that evidence only in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink or other substance knowing that it could produce an intoxicating affect [*sic*] or willingly assuming the risk of that affect [*sic*]. [¶] You may not consider evidence of voluntary intoxication for any other purpose."
>
> CALCRIM No. 625 is a correct statement of the law. . . . [Footnote.] Evidence of voluntary intoxication is admissible solely on whether the defendant actually formed a required specific intent or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought. . . . Defendant did not ask the trial court to clarify or modify the CALCRIM No. 625 instruction. Defendant may not argue on appeal that an instruction correct in law was too general or incomplete and, thus, needed clarification, without first requesting such clarification at trial. . . .

* * *

/ / /

12

Defendant nevertheless contends he may raise his claim of instructional error on appeal because the CALCRIM No. 625 instruction misstated the law and violated his constitutional right to due process. We have already explained that the CALCRIM No. 625 instruction was a correct statement of the law. In addition, defendant has not met his burden in establishing a due process violation. In any event, any instructional error was harmless.

Murder is the unlawful killing of a human being with malice aforethought . . . . Malice aforethought may be express or implied. . . . Express malice is an intent to kill. . . . Malice is implied when a person willfully commits an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses. . . . The killing of a human being with malice aforethought, willfulness, premeditation, and deliberation is first degree murder. . . . The killing of a human being with malice aforethought, but without willfulness, premeditation and deliberation is second degree murder. . . . Voluntary intoxication can negate express malice, premeditation, and deliberation and reduce a crime from first to second degree murder. . . .

Manslaughter is the unlawful killing of a human being without malice aforethought. . . . A defendant lacks malice and is guilty of voluntary manslaughter when he acts in a sudden quarrel or heat of passion or when he kills in unreasonable or imperfect self-defense. . . . One who kills while holding an actual but unreasonable belief that he is in imminent danger of death or great bodily injury and that it is necessary to defend himself (also known as imperfect self-defense) does not harbor malice aforethought and commits voluntary manslaughter, not murder. . . . Whether the defendant actually held the requisite belief for imperfect self-defense is to be determined by the trier of fact based on all the relevant facts, including the defendant's voluntary intoxication. . . .

The trial court correctly instructed that evidence of defendant's intoxication was relevant to whether defendant acted with an intent to kill or deliberation and premeditation. . . . Regarding imperfect self-defense, the trial court instructed the jury that defendant acted in imperfect self-defense if he actually believed he was in imminent danger of being killed or of great bodily injury, or if he was in imminent danger of being robbed and he actually believed the immediate use of deadly force was necessary to defend against the danger, but at least one of those beliefs was unreasonable. The trial court correctly stated that defendant was guilty of voluntary manslaughter, not murder, if he killed a person because he acted in imperfect self-defense. . . . The trial court told the jury to consider all circumstances as appeared to defendant in assessing whether defendant acted in imperfect self-defense. All circumstances as appeared to defendant would include a consideration of defendant's state of intoxication.

Defendant did not argue to the jury that his state of intoxication affected his belief in the need for self-defense. Further, there was compelling evidence defendant did not act in imperfect self-defense. The restaurant manager's testimony showed defendant fired his gun at Jackson with the intent to kill Jackson, and defendant did not actually believe he was in imminent danger of death or great bodily injury when, after firing several shots at and injuring Jackson, he returned to where Jackson was lying on

the sidewalk and fired a shot at Jackson's head while stating, "I told you this mother fucking shit was going to happen." Apparently, the jury found this account of the shooting more credible than defendant's account.

It is true that the prosecutor argued the jury could only consider voluntary intoxication in deciding whether defendant acted with intent to kill or acted with premeditation or deliberation and not for any other purpose. But the prosecutor made that statement in the context of arguing that defendant intended to kill Jackson. The prosecutor did not discuss voluntary intoxication in the context of imperfect self-defense.

For all of these reasons, any error in the trial court's instruction on voluntary intoxication was harmless even under the *Chapman v. California*. . . standard. . . .

People v. Davis, 2015 WL 7280796 (Cal. App. Nov. 18, 2015) (unpub.).

The court finds the state court's denial of petitioner's CALCRIM No. 625 claim was neither contrary to nor based on an unreasonable application of clearly established law.  As the Court of Appeal observed, the compelling evidence in petitioner's case indicated imperfect self-defense was not supported by the facts.  The court stated: "The restaurant manager's testimony showed defendant fired his gun at Jackson with the intent to kill Jackson, and defendant did not actually believe he was in imminent danger of death or great bodily injury when, after firing several shots at and injuring Jackson, he returned to where Jackson was lying on the sidewalk and fired a shot at Jackson's head while stating, 'I told you this mother fucking shit was going to happen.'"  People v. Davis, 2015 WL 7280796 (Cal. App. Nov. 18, 2015) (unpub.).  Given that the evidence did not support imperfect self-defense to begin with, it was not possible for CALCRIM No. 625 to have confused the jury as to whether intoxication was a relevant issue in determining imperfect self-defense.  For this reason, the trial court could not have erred by instructing the jury pursuant to CALCRIM No. 615 and, even if it had erred, any error was harmless under the Champan standard.

### 2.    CALCRIM Nos. 522 and 570

Petitioner contends the trial court erred ". . .by not instructing that provocation that did not meet the average person standard for voluntary manslaughter could reduce first degree murder to second degree murder."  ECF No. 1, pgs. 59-67.  According to petitioner, CALCRIM No. 522 is ambiguous and misleading when combined with the definition of provocation given in

14

1    CALCRIM No. 570.  See id.  As to petitioner's claim regarding provocation instructions, the

2    California Court of Appeal held:

> Defendant also argues the trial court erred in failing to instruct that even if
> there is insufficient provocation under an objective standard, defendant's
> subjective belief in the provocation could reduce first degree murder to
> second degree murder.  He argues the instructions given to the jury –
> CALCRIM No. 522 (provocation: effect on degree of murder) and
> CALCRIM No. 570 (voluntary manslaughter: sudden quarrel or heat of
> passion) – erroneously suggested an objective standard of provocation
> applied to reduce first degree murder to second degree murder.
>
> In reviewing a claim that the court's instructions are misleading, we
> inquire whether there is a reasonable likelihood the jury understood the
> challenged instructions in the manner the defendant asserts. . . . We
> consider the instructions as a whole and assume the jurors are intelligent
> persons capable of understanding and correlating all the instructions. . . .
> We interpret the instructions in a manner consistent with the judgment
> if the instructions are reasonably susceptible to such interpretation. . . .
>
> . . . [H]eat of passion precludes the formation of malice aforethought and
> reduces an unlawful killing from murder to voluntary manslaughter. . . .
> The heat of passion requirement for voluntary manslaughter has subjective
> and objective components. . . . "The defendant must actually, subjectively,
> kill under the heat of passion. [Citation.] But the circumstances giving rise
> to the heat of passion are also viewed objectively." . . . The facts and
> circumstances must be sufficient to arouse the passions of an ordinarily
> reasonable person. . . . "Heat of passion arises if, ' "at the time of the
> killing, the reason of the accused was obscured or disturbed by passion to
> such an extent as would cause the ordinarily reasonable person of average
> disposition to act rashly and without deliberation and reflection, and from
> such passion rather than from judgment." ' " . . .
>
> Heat of passion arising from provocation can also negate premeditation
> and deliberation and reduce a murder from first to second degree. . . . The
> test for whether provocation reduces the degree of a murder is subjective
> . . . . "The issue is whether the provocation precluded the defendant from
> deliberating. [Citation.] This requires a determination of the defendant's
> subjective state." . . .
>
> . . . [B]ased on our review of the instructions as a whole, we conclude
> there is no reasonable likelihood the jury understood that it could find
> defendant guilty of first degree murder without assessing his subjective
> state of mind. The jury was instructed on murder pursuant to CALCRIM
> Nos. 520 and 521.  The trial court told the jury defendant committed
> murder if he committed an act that caused the death of a person, he acted
> with malice aforethought, and he killed without a lawful excuse or
> justification. The trial court explained express and implied malice
> aforethought. It also told the jury if defendant committed murder and he
> acted willfully, deliberately, and with premedication, defendant was guilty
> of first degree murder.  Otherwise, defendant was guilty of second degree
> murder.  The trial court explained the terms willfully, deliberately, and
> with premeditation.

Regarding the effect of provocation on the degree of murder committed, the trial court instructed with CALCRIM No. 522. The trial court said, "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but [was] provoked, consider the provocation in deciding whether the crime was first or second degree murder. [¶] Also consider the provocation in deciding whether the defendant committed murder or manslaughter."

Using CALCRIM No. 570, the trial court then instructed that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The trial court instructed that defendant killed someone because of a sudden quarrel or in the heat of passion if: (1) he was provoked, (2) as a result of the provocation, he acted rashly and under the influence of intense emotion that obscured his reasoning or judgment, and (3) the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. The trial court said, "In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment. [¶] If enough time passed between the provocation and the killing for an ordinary person of average disposition to cool off and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis."

The instructions informed the jury of the necessary mental state for first and second degree murder and that provocation can reduce a murder from first to second degree. The jury was instructed that defendant was guilty of second degree murder if he killed with malice aforethought but was provoked. The term provocation in CALCRIM No. 522 is used in a non-technical sense. . . . Provocation means " 'to arouse to a feeling or action ... [or] to incite to anger.' " . . . "The evidentiary premise of a provocation defense is the defendant's emotional reaction to the conduct of another ..." . . . The jury would necessarily be required to evaluate defendant's subjective state of mind to determine whether he was provoked to act. The CALCRIM No. 522 instruction on reducing murder from first to second degree does not contain an objective test for provocation. CALCRIM No. 570, which contains an objective test for provocation, dealt expressly and exclusively with provocation to reduce murder to voluntary manslaughter . . . .

The arguments to the jury did not suggest a contrary standard. The prosecutor said provocation necessary to reduce murder to voluntary manslaughter is evaluated under an objective standard. He explained provocation can also reduce first degree murder to second degree murder. The prosecutor did not argue an objective test applied to reduce murder from first to second degree. . . . Defense counsel did not address whether an objective or subjective test applied to reduce the degree of a murder. In fact, defense counsel did not rely on provocation or heat of passion to argue that defendant committed second, rather than first, degree murder. Defendant's trial counsel argued instead that at most defendant was guilty of voluntary manslaughter.

16

Defendant claims the word "reduce" in CALCRIM No. 522 incorrectly implies that the jury may find defendant guilty of first degree murder and may then consider whether provocation reduces the murder from first to second degree. We disagree. The trial court instructed that in order to find defendant guilty of first degree murder, the jury must find defendant acted willfully, deliberately, and with premeditation. The trial court said a decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated. Read with the instruction on first degree murder, CALCRIM No. 522 conveys " 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' " . . . The jury would have understood the existence of provocation would support the absence of premeditation and deliberation and, thus, preclude a first degree murder finding. . . .

CALCRIM Nos. 521, 522 and 570 are not misleading when given together. . . .

People v. Davis, 2015 WL 7280796 (Cal. App. Nov. 18, 2015) (unpub.).

The court finds the state court's decision was neither contrary to nor based on an unreasonable application of clearly established law. As explained above, claims of erroneous jury instructions generally do not implicate a constitutional right unless the trial was rendered fundamentally unfair as a result of an erroneous instruction. In order to evaluate an instruction under this standard, the court must view the challenged instruction in light of all the instructions given by the trial court. Doing so here reflects that instructions under CALCRIM Nos. 522 and 570 did not confuse the jury as to the requires elements of the charged offense or the burden of proof. As the state court noted:

. . . Read with the instruction on first degree murder, CALCRIM No. 522 conveys " 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' " . . . The jury would have understood the existence of provocation would support the absence of premeditation and deliberation and, thus, preclude a first degree murder finding. . . .

People v. Davis, 2015 WL 7280796 (Cal. App. Nov. 18, 2015) (unpub.).

Contrary to petitioner's argument that the instruction on provocation failed to inform the jury that provocation is determined under an "average person standard," the trial court instructed the jury to consider the issue under the standard of "a person of average disposition." See id.

/ / /

/ / /

17

1     **B.**     **Denial of Continuance**

2         Petitioner claims the trial court abused its discretion in denying him a continuance

3 to retain counsel to file a motion for a new trial.  See ECF No. 1, pgs. 71-77.  The California

4 Court of Appeal addressed this claim as follows:

> Defendant further asserts that the trial court abused its discretion in denying defendant's request for continuance so that defendant could retain private counsel to file a new trial motion based on ineffective assistance.
>
> A defendant has the right to retain counsel of his choice as part of his right to effective assistance of counsel and due process of law. . . . However, that right is not absolute. . . .The right to counsel of one's choice " 'must be carefully weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts of the particular case.' " . . .
>
> Continuances are granted in a criminal proceeding only upon a showing of good cause. . . . Such showing requires the party seeking a continuance to demonstrate that counsel and the party acted with due diligence. . . . A trial court may deny a request for continuance if the defendant is unjustifiably dilatory in obtaining counsel. . . .
>
> A trial court has broad discretion to determine whether good cause exists to grant a continuance. . . . The trial court abuses its discretion only when it exceeds the bounds of reason, all circumstances being considered. . . . The party challenging the trial court's denial of a motion for continuance bears the heavy burden of establishing a clear abuse of discretion. . . . We look at the circumstances of each case, particularly the reasons presented to the trial judge at the time the request for continuance was denied, in deciding whether the trial court's denial of a continuance was so arbitrary as to deny due process. . . .
>
> The lateness of a request for continuance can be a significant factor justifying denial, absent compelling circumstances to the contrary. . . . Here, defendant had about a month to obtain private counsel before his sentencing hearing if he wanted to do so. Two days before the sentencing hearing, the trial court received a letter purportedly from defendant's mother stating defendant's family wanted a continuance of the sentencing hearing so that the family could retain counsel for a new trial motion. The letter says defendant was seeking a new trial based on ineffective assistance of counsel. Defendant did not sign the letter, and we cannot determine whether he received a copy of the letter. The letter does not explain the reason for the delay in notifying the trial court of a need for a continuance. . . . Defendant did not move for a continuance until the day of the sentencing hearing. No explanation was given for defendant's late request. The record on appeal does not contain any written notice to continue the sentencing hearing or show of good cause for defendant's failure to file a written notice. [Footnote] The trial court could reasonably find under those circumstances that defendant's motion for a continuance was untimely. . . .

18

. . . [D]efendant here did not demonstrate that he made a good faith, diligent effort to obtain counsel. . . . The letter from defendant's mother does not describe what efforts defendant or his family members made to hire private counsel. No such information was presented at the sentencing hearing when defendant's trial counsel made an oral motion for a continuance. There was no indication as to when defendant formed the pinion that his trial counsel's representation was inadequate. There was no basis for the trial judge to conclude defendant was not responsible for the delay in obtaining private counsel. . . .

Defendant's trial counsel said defendant and his mother were "in the process of retaining" an attorney in Berkeley, but had not yet retained that person. Defendant did not give the trial court any information about when defendant or his family would retain the Berkeley attorney or what was required to complete the process of retaining that attorney. Defendant attempts to place the burden on the trial court to elicit information regarding good cause for a continuance. But the burden was on defendant to affirmatively prove the grounds for his motion. . . . Denial of a continuance is proper where, as here, the prospect of hiring private counsel was still speculative at the time defendant moved for a continuance. . . .

The letter from defendant's mother states defendant would seek a new trial based on ineffective assistance of counsel. Defendant's trial counsel said the Berkeley attorney would need to see the transcripts to evaluate and prepare any new trial motion, and that defendant's mother indicated it would take three to four months. Defendant did not specify the potential grounds for a new trial motion based on ineffective assistance of counsel. [Footnote] . . . [N]o new attorney appeared at the hearing in this case. . . .

Defendant claims the trial court denied his request for a continuance based solely on its observation that his trial counsel's in-court performance was competent. The record does not support that assertion. The trial court said defendant had almost a month to hire the Berkeley attorney and it did not appear the Berkeley attorney had been retained. The trial court denied defendant's motion for lack of good cause.

The trial court did not abuse its discretion in finding no good cause for a continuance. . . .

People v. Davis, 2015 WL 7280796 (Cal. App. Nov. 18, 2015) (unpub.).

Respondent argues petitioner cannot obtain federal habeas relief on this claim because there is no clearly established law, as announced by the United States Supreme Court, which provides that the denial of a discretionary continuance violates the Constitution. The court agrees and notes that petitioner has not cited to any such Supreme Court precedent. While the state courts have authority to review lower discretionary rulings, a federal habeas court has no such authority over the state courts. See Williams v. Borg, 139 F.3d 737, 740 (9th Cir. 1998).

/ / /

19

**C.**      **Ineffective Assistance of Trial Counsel**

Petitioner argues that, to the extent it is determined either of the claims addressed above were waived, trial counsel was ineffective for failing to raise them. Respondent suggests – but does not specifically argue – these claims, which were never properly presented to the state court, are unexhausted and must be denied.

Under 28 U.S.C. § 2254(b), the exhaustion of available state remedies is required before claims can be granted by the federal court in a habeas corpus case. See Rose v. Lundy, 455 U.S. 509 (1982); see also Kelly v. Small, 315 F.3d 1063, 1066 (9th Cir. 2003); Hunt v. Pliler, 336 F.3d 839 (9th Cir. 2003).[4] The exhaustion doctrine is based on a policy of federal and state comity, designed to give state courts the initial opportunity to correct alleged constitutional deprivations. See Picard v. Connor, 404 U.S. 270, 275 (1971); see also Rose, 455 U.S. at 518. "A petitioner may satisfy the exhaustion requirement in two ways: (1) by providing the highest state court with an opportunity to rule on the merits of the claim . . .; or (2) by showing that at the time the petitioner filed the habeas petition in federal court no state remedies are available to the petitioner and the petitioner has not deliberately by-passed the state remedies." Batchelor v. Cupp , 693 F.2d 859, 862 (9th Cir. 1982) (citations omitted). Exhaustion is not a jurisdictional requirement and the court may raise the issue sua sponte. See Simmons v. Blodgett, 110 F.3d 39, 41 (9th Cir. 1997).

Regardless of whether the claim was raised on direct appeal or in a post-conviction proceeding, the exhaustion doctrine requires that each claim be fairly presented to the state's highest court. See Castille v. Peoples, 489 U.S. 346 (1989). Although the exhaustion doctrine requires only the presentation of each federal claim to the highest state court, the claims must be presented in a posture that is acceptable under state procedural rules. See Sweet v. Cupp, 640 F.2d 233 (9th Cir. 1981). Thus, an appeal or petition for post-conviction relief that is denied by the state courts on procedural grounds, where other state remedies are still available, does not exhaust the petitioner's state remedies. See Pitchess v. Davis, 421 U.S. 482, 488 (1979); Sweet,

---

[4]     Claims may be denied on the merits notwithstanding lack of exhaustion. See 28 U.S.C. § 2254(b)(2).

1    640 F.2d at 237-89.[5]

2         Petitioner contends his trial counsel was ineffective to the extent either of his

3    instructional error claims were found to have been waived.  These claims were raised in

4    petitioner's direct appeal to the California Court of Appeal.  As to petitioner's CALCRIM No.

5    625 claim, the state court held: "We do not consider defendant's ineffective assistance of counsel

6    claim because we have considered the merits of his instructional error claim and conclude there is

7    no prejudicial error."  People v. Davis, 2015 WL 7280796 (Cal. App. Nov. 18, 2015) (unpub.).

8    Similarly, as to petitioner's claim of instructional error regarding provocation, the Court of

9    Appeal stated: "We do not consider defendant's ineffective assistance of counsel claim because

10   we conclude there is no instructional error."  Id.

11        Petitioner raised the exact same claims in his petition for review by the California

12   Supreme Court as he did in his brief on direct appeal to the California Court of Appeal.  See ECF

13   No. 13-11 (lodged copy of petitioner's petition for review).  The California Supreme Court

14   denied the petition for review without comment or citation.  See id. (lodged copy of California

15   Supreme Court's denial of direct review).  Given that petitioner did in fact raise his ineffective

16   assistance of counsel claims to the California Supreme Court, which did not impose any

17   procedural default which would bar federal review of those claims, this court rejects respondent's

18   suggestion the claims are unexhausted.

19        Turning to the merits of petitioner's claims, the Sixth Amendment guarantees the

20   effective assistance of counsel.  The United States Supreme Court set forth the test for

21   demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).

22   First, a petitioner must show that, considering all the circumstances, counsel's performance fell

23   below an objective standard of reasonableness.  See id. at 688.  To this end, petitioner must

24   identify the acts or omissions that are alleged not to have been the result of reasonable

25   professional judgment.  See id. at 690.  The federal court must then determine whether, in light of

26

27          [5]    This situation of procedural deficiency is distinguishable from a case presented to
     the state court using proper procedures but where relief on the merits is precluded for some
     procedural reason, such as untimeliness or failure to raise the claim on direct appeal.  The former
28   represents an exhaustion problem; the latter represents a procedural default problem.

all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. See id. In making this determination, however, there is a strong presumption "that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice. See Strickland, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

Petitioner has not demonstrated that the state court's decision not to consider the ineffective assistance of counsel claims was either contrary to or based on an unreasonable application of the Strickland standard. The state court did not consider these claims because it found no underlying error with respect to the jury instructions. For this reason, counsel's performance regarding jury instructions was neither deficient nor resulted in prejudice. The state court's decision on petitioner's ineffective assistance of counsel claims was consistent with Strickland.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# IV. CONCLUSION

Based on the foregoing, the court concludes that petitioner is not entitled to federal habeas corpus relief.

Pursuant to Rule 11(a) of the Federal Rules Governing Section 2254 Cases, the court has considered whether to issue a certificate of appealability. Before petitioner can appeal this decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). Where the petition is denied on the merits, a certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why such a certificate should not issue. See Fed. R. App. P. 22(b). Where the petition is dismissed on procedural grounds, a certificate of appealability "should issue if the prisoner can show: (1) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling'; and (2) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'" Morris v. Woodford, 229 F.3d 775, 780 (9th Cir. 2000) (quoting Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595, 1604 (2000)). For the reasons stated herein, the court finds that issuance of a certificate of appealability is not warranted in this case.

Accordingly, IT IS HEREBY ORDERED that:

1.     The substitution of attorneys, filed on September 13, 2017 (ECF No. 24) is approved nunc pro tunc to September 13, 2017;

2.     Petitioner's petition for a writ of habeas corpus (ECF No. 1) is denied;

3.     The court declines to issue a certificate of appealability; and

4.     The Clerk of the Court is directed to enter judgment and close this file.

Dated:  August 16, 2019

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE